## MARTIN McGRATH v. THE STATE.

### *No. 849.   Decided February 12th, 1896.*

35   413
35   570
36   411
38   612

#### 1.   Continuance—Diligence.

The case, which was a murder trial, was, on the 26th of ·January, set for trial on the 20th of February.   The absent witness, who was a transient person from Minne-sota, had testified on the previous examining trial of defendant, and defendant after-wards paid his board at a hotel, where the witness remained until the 2nd of Febru-ary, when he wrote a note to defendant stating that he was gone, but not stating where.   Three days before he left, defendant had his first process, a subpœna, issued for him, but did not inform the officers where the witness could be found, so that he could be served with the process; and took no other steps ·from that time on up to the date of trial to ascertain the whereabouts of the witness, or to secure his attend-ance by any other legal means.   Held:   The diligence was insufficient, and the appli-cation for continuance properly overruled.

#### 2.   Same.

Where it was shown that a witness named in the application for continuance sub-sequently, during the trial, appeared in court, but was not placed on the stand by defendant.   Held: That defendant has no ground to complain, so far as that witness was concerned, that his application for continuance had been overruled.

#### 3.   Same.

Where it is shown that the trial lasted several days; that the absent witnesses, who had been subpœnaed, lived in the county and could probably have been brought into court by attachment, had it been sued out promptly after it was known they were absent—which was not done—and no other effort made to secure their attendance. Held:   Defendant had no ground of complaint because the continuance had been re-fused.

#### 4.   Same—Practice on Appeal.

Where an application for continuance was based upon the testimony of witnesses to prove threats of deceased to kill defendant on the night of the homicide, and the court, on appeal, in the light of the other evidence in the case, are doubtful that evi-dence of such threats would have been material, in view of the fact that no overt act on the part of deceased to carry out such threats was proved.   Held: The overruling of the motion for continuance will not constitute ground for reversal.

#### 5.   Murder—Examination of Witness.

On a trial for murder, where a witness has described the difficulty—the position of the parties during the difficulty—that deceased was in his (witness') view during the entire time, and that he saw no weapon in his (deceased's) hand, a question by the State's counsel to the witness: "If the deceased, R., had a knife or pistol, or any other weapon in his hand, state whether or not you were in a position from which you could have seen it?"   To which the witness answered "yes."   Held: No error in per-mitting the question to be asked and answered.

#### 6.   Evidence—Immaterial.

On a trial for murder, after a witness had testified that he told an officer that he was going to make a complaint against some gambling houses, it was immaterial that the court refused to permit defendant, on cross-examination, to prove that the officer told him that, if he (the witness) would make the complaint, he (the officer) would serve the process.   And so, it was also immaterial to prove what the officer thought about the defendant's intentions towards a third party, who kept a rival gambling house.

#### 7.   Bill of Exceptions to Admission of Evidence.

A bill of exceptions to the admission of evidence, which merely states that the same was irrelevant and immaterial, is entirely too general.   The allegations of a bill of exceptions should be full and explicit; and, where the objection is to the ad-missibility of the testimony, the very ground of objection should be stated, so that the question may be fairly presented to the court; and the mere statement, as a

ground of objection, that the testimony is immaterial is not sufficient, unless obviously the testimony cannot be considered material for any purpose.

### 8. Evidence—Admission of—Practice.

A party should not be permitted to allow the introduction of a part of the details of a transaction. and permit them to remain in evidence, and then object to the remainder, thereby suiting his own purpose in the evidence, and cutting off further testimony on the subject; and, the admission of such further testimony cannot be claimed as prejudicial to him.

### 9. Witness—Credibility of, How Attacked.

It is competent to show that a witness for defendant was engaged in renting rooms to prostitutes, as testimony going to his credit before the jury.

### 10. Conflict in Evidence Supporting Defendant's General Reputation for Veracity.

Simply because a conflict exists between the testimony of other witnesses and a defendant, will give the defendant no right to support his testimony by proof of his general reputation for truth.

### 11. Murder—Charge of Court—Practice on Appeal.

On a trial for murder, if defendant be acquitted of murder in the first degree, the court, on appeal, will not discuss supposed errors in the charge relating to murder in the first degree.

### 12. Same—Implied Malice.

A charge upon implied malice, to the effect that, "implied malice is that malice which the law infers from, or imputes to, certain acts; that is to say, where the fact of an unlawful killing is established, and there are no facts nor circumstances in evidence which establish the existence of express malice," etc.: and it was objected. that the charge was erroneous, in using the words, "which establish," instead of the words, "which tend to show," the existence of express malice, etc. Held: The objection is not a valid one. It is more in keeping with the correct definition, and more liberal towards the defendant to require that the facts absolutely show express malice, before the jury would be required to deprive a defendant of implied malice. The mere tendency of the facts on the one hand or the other, is not enough.

### 13. Same—Charge as to Conflict in Testimony.

On a trial for murder, where the court charged the jury that they were the exclusive judges of the credibility of witnesses, weight of evidence, etc., and, "you should reconcile all conflicts in the testimony, if you can. but if you cannot, you must decide which of the testimony is entitled to the greater credibility and weight; and, in so determining, you must consider the intelligence, interest, apparent bias or prejudice, if any, of the witnesses, as well as their manner of testifying." Held: A similar charge was approved in Cockerell v. State, 32 Tex. Crim. Rep., 585.

### 14. Murder—Defense of Another—Appearances of Danger.

On a trial for murder, where the defendant testified that he saw the rencounter between deceased and his (defendant's) brother, and described the struggle; and, testified, that he shot the deceased to prevent him from shooting his brother and then shooting him. Held: That it was not necessary, under such facts, to charge upon appearances of danger from defendant's standpoint; and, Held, further, that a charge which, in effect, instructed the jury, that if defendant, seeing a struggle going on between his brother and deceased over a pistol, and that defendant fired upon and killed deceased, to prevent deceased from shooting or injuring his brother with said pistol, then to acquit defendant, or if not satisfied, beyond a reasonable doubt, that the struggle for the pistol was not going on between the parties at the time defendant began to shoot deceased, then, and in that event also, to acquit. Held: That the instruction gave defendant a full and complete right of self-defense upon the facts.

### 15. Same—Manslaughter.

On a trial for murder, where the evidence makes the case either one of murder in the second degree or self-defense, it is not error for the court to fail or refuse to charge upon manslaughter.

ON MOTION FOR REHEARING.

**16.  As to the Necessity of Defining Manslaughter, etc., in a Charge Upon Murder in the Second Degree.**

Murder in the second degree, is a homicide upon malice formed in a mind incited by passion, but without adequate cause. Manslaughter, on the other hand, is where the passion was engendered by adequate cause. And where the court has instructed the jury, that in order for a killing to be upon malice, there must be on the one hand malice aforethought, but not express; and on the other, that there must be no circumstances to reduce the killing to manslaughter, or to excuse or justify the act, the boundaries of the offense of murder in the second degree are sufficiently given, and it is not required that the charge should go further, and in connection with implied malice define the offense of manslaughter, negligent homicide, and the circumstances which excuse or justify the act.

Aᴘᴘᴇᴀʟ from the District Court of Tarrant. Tried below before Hon. W. D. Hᴀʀʀɪs.

Appellant, Martin McGrath, was indicted by a grand jury of Tarrant County on the 19th day of January, 1895, for the murder of James Rushing, alleged to have been committed in said county on the 30th day of December, 1894. He was tried on said charge on the 20th day of February, 1895, and found guilty of murder in the second degree, and his punishment assessed at nine years in the penitentiary, and judgment and sentence accordingly.

A concise statement of the essential features of the case, as made by the evidence, is as follows: Deceased was a violent and dangerous man, which fact was well known to appellant. He was employed by one Strong, who ran a gambling house near the place of business of appellant. Connected with that gambling house were other violent and turbulent characters, such as Bob Miller and Sam McHam. Strong had been having trouble with the officers, and his gambling house had been closed up. He blamed appellant for this, and his employees, and especially Rushing, took up their employer's side of the quarrel. For some days, about a week, before the fatal encounter, deceased was making deadly threats against the life of appellant, which threats were communicated to and well known to appellant. Appellant had not seen deceased during this time, and had been avoiding him. The night before the killing appellant and Strong had a dangerous difficulty, in which pistols were drawn and used as bludgeons, about this same gambling house belonging to Strong. On the night before the killing, he was informed by an employee of Strong, a colored man named Black, that Sam McHam was up at Strong's, trying to get Bob Miller and deceased to get pistols and come to his place to fight him. He was then on his way home, and went on home to avoid trouble. On the morning of the day of the killing, Capt. Shiel told him of threats against his life made by deceased, and warned him to be on his guard. On that same evening Tom Talbot told him that deceased had, that evening, made threats against him, and also warned him to be on his guard. Just prior to the killing, which occurred at 8 or 9 o'clock at night, appellant was upstairs over his saloon, with others. He heard a difficulty in progress in the saloon below. He asked Mike Cassady to go below and see what was

the matter down there. He went and came back immediately, and reported that deceased and Bob Miller were down there "raising a row," to use the language of appellant, with Peter Crow, a brother of appellant, "Crow" being a nick-name. Appellant went at once to where the difficulty was in progress, and he was there confronted with this man Miller and deceased, they being then engaged, according to all the evidence, in an altercation with his brother, Peter Crow. This brother was afflicted, being at least partially insane.

J. H. Phelps, for the State, testified in substance, that he saw the fatal difficulty. That during or just after such altercation appellant came into the saloon. That two parties had taken hold of Crow to keep him off of Rushing. That they were in a tussel with Crow, and that about that time appellant came in with his pistol in his hand, cocked, and immediately fired at Rushing. That Crow got hold of appellant and tried to prevent his shooting again, but, despite his efforts, appellant kept firing until Rushing was killed. Did not see Rushing with a weapon of any kind. If Rushing had had a weapon of any kind, knife or pistol, was in a position to have seen it. Other parties were in the saloon, who were strangers to witness.

H. R. Kinniard, brother-in-law of Phelps, testified for the State substantially as did Phelps.

John Mantle testified for appellant that he was appellant's half brother. That he had gone into the saloon in front of appellant after having heard that deceased and others were in a difficulty with Peter Crow, a brother of appellant, Crow being a nickname, they, witness and appellant, being upstairs when they heard this. That on entering the saloon Rushing confronted him with a pistol in his hand, presented at his face. That he grappled with Rushing, and that while he was struggling with Rushing to prevent Rushing from shooting him the fatal shots were fired. Appellant testified to substantially the same as Mantle as to his going down to where the difficulty was in progress; and, further, that when he got to the door of the saloon, and was in the act of entering, Mantle already having gone in, that he was confronted with one Bob Miller, standing inside of the saloon making movements as if to draw a pistol. That he drew his pistol, and on Miller getting out of the way, he saw his brother Mantle and Rushing scuffling over a a pistol, and that he shot Rushing to keep him from killing his brother, Mantle, and then as he expected killing him.

R. E. Ferguson testified for appellant that he was keeping bar for appellant at the time and was behind the bar in the saloon. After detailing the actions of Bob Miller and deceased and others in the saloon in which they were in a difficulty with Peter Crow, he says that Mantle came in the saloon and Rushing grabbed him, and they scuffled around in the saloon, and then he saw appellant come to the door, and he heard a shot, and then other shots, three altogether. Rushing and Mantle were scuffling at the time. Only saw that Rushing and Mantle were scuffling, could not see anything they were scuffling over; could not say

that he was in a position to see what they were scuffling over. Appellant and Mantle had heard the difficulty from upstairs (see their evidence as before), and appellant had requested Mike Cassady to go down and see about it, and on Cassady's return and report of the matter, appellant and Mantle went downstairs. Miller had been manipulating a pistol around in the saloon just before the shooting, and an open knife had been found on deceased's person, in a pocket of his overcoat, after his death.

The matters pertaining to appellant's application for continuance, are sufficiently stated in the opinion.

Defendant's bill of exceptions No. 2, shows that the witness, J. H. Phelps, was asked by the State: "If the deceased, Rushing, had a knife or pistol, or any other weapon in his hand, state whether or not you were in a position you could have seen it?" This was objected to by the defendant as being leading and argumentative. The court overruled the objection and the witness answered "yes," and defendant took his bill. Bill No. 4 shows that same question and answer occurred while the State was examining the witness Kinniard, and that appellant made the same objections.

Defendant's bill No. 10, shows that H. P. Shiel, a witness for appellant, after testifying, on cross-examination by the State, that he formerly ran a saloon in Fort Worth for about six years, and that he had gone out of the saloon business about three years ago, the June before, and that he had rooms connected with said saloon, was asked by the State if he had not rented those rooms to prostitutes? This was objected to by the defendant as irrelevant, incompetent and immaterial. This objection was overruled, and the witness answered "that said rooms were occupied by prostitutes."

Defendant's bill of exceptions No. 13, shows that appellant offered to prove his good reputation for truthfulness in the community in which he resided, by John Yancy and others, naming them. This was objected to by the State, because the defendant's truthfulness had not been put in issue. The defendant's counsel contended that as there was a conflict in the evidence between witness for the State and defendant, that defendant ought to be permitted to prove such reputation. The court sustained the objection of the State, and the defendant reserved his bill.

Defendant's bills of exceptions, reserved to the charge of the court, upon murder in the second degree, and the method by which the jury should pass upon the credibility of the witnesses, need not be reproduced here, inasmuch as the charges themselves will be found set out in full in the opinion of the court; as is also the charge of the court upon self-defense, which is complained of for error by appellant.

*Furman & Bowlin,* for appellant.—The court erred in the charge upon murder in the second degree.

It is not the law that malice is to be inferred from the absence of evidence showing express malice or an excuse or justification of the act.

The law is: That if an unlawful killing is established, and there are no circumstances in evidence which tend to establish express malice, nor none which tend to mitigate, excuse or justify the act, then the law implies malice, and the homicide is murder in the second degree.    A defendant on trial for murder is not required to show a complete excuse or justification in order that the jury may not infer malice and convict him of murder in the second degree.    If there are circumstances in evidence which tend to mitigate, justify or excuse the act, then the law does not imply malice.    Willson's Crim. Stat., Sec. 1028, and cases cited; also Martinez v. State, 30 Tex. Crim. App., 129.

Appellant excepted to the charge of the court, which instructed the jury with regard to their duty in reconciling conflicts in the evidence; because, said charge was not the law and was calculated, under the circumstances, to cause the jury to disregard the evidence of defendant and his brother and other witnesses to his defense, and because the same was upon the weight of evidence.    In approving this bill of exceptions, the court cited, as authority for the charge which he had given, the case of Cockerell v. State, 32 Tex. Crim. Rep., 593.

1.    Said charge is a dangerous elaboration of the simple proposition as laid down in the statute, that the jury in all cases are the exclusive judges of the facts proved, and of the weight to be given the testimony (Code Crim. Proc., Art 728), and should never be given in any case, and especially where a defendant testifies in his own behalf.

2.    Such charge indirectly called the attention of the jury to the interest of defendant in the case, as no other person was interested in the case but him, and was also a charge upon the weight of the evidence. If the charge had directly called the attention of the jury to defendant's interest in the case, it would have been error, as was decided in this court in Muely v. State, 31 Tex. Crim. Rep., 155, and the court should not be permitted to do indirectly what it could not do directly. See Muely v. State, supra; Willson's Crim. Stat., Secs. 1071 and 2425, et seq.

The charge of the court, on self-defense, omitted to tell the jury that they were to view the matter from defendant's standpoint.

In all cases where the issue of self-defense is raised on the trial of a case, the jury should be charged that they are to view the transaction from the standpoint of the defendant, taking into consideration all the facts and circumstances as they appeared to defendant, and was known to him at the time.    Willson's Crim. Stat., Sec. 1070.

The court erred in failing and refusing to charge on manslaughter.

1.    Where, in a trial for murder, there are any facts or circumstances in evidence tending to show "adequate cause," the court should submit an appropriate charge on the law of manslaughter to the jury.

2.    Although appellant's theory of the case, from his own evidence, may have indicated that he acted in self-defense, or in the defense of his brother, John Mantle, yet if the other evidence in the case tended to

show "adequate cause," appellant was entitled to an instruction on that issue.

3.   All the facts and circumstances in the case, such as the bad feeling and ill will of Strong towards appellant, and the participation therein of deceased, the threats of deceased against appellant, the dangerous character of deceased, the conduct of deceased and others in appellant's saloon at the time of and just prior to the fatal shooting, the report that was made to appellant by Cassady, as to the treatment of appellant's afflicted brother by deceased and others, and appellant suddenly coming upon deceased and others acting with him in his (appellant's) place of business, was calculated to render the mind of a person of ordinary temper incapable of cool reflection, thus producing "adequate cause," and called for a charge upon the law of manslaughter.   Milrainey v. State, 33 Tex. Crim. Rep., 577;  Jones v. State, 29 Tex. Crim. App., 338; Bracken v. State, Id., 362;  Miles v. State, 18 Tex. Crim. App., 170; Howard v. State, 23 Tex. Crim. App., 265;  Wadlington v. State, 19 Tex. Crim. App., 266;  Bonner v. State, 29 Tex. Crim. App., 223; James v. State, 32 Tex. Crim. Rep., 509.

*J. S. Davis, O. S. Lattimore,* and *Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was tried on an indictment charging him with murder, was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of nine years; and from the judgment and sentence of the lower court he prosecutes this appeal.   The appellant made a motion for a continuance on account of the absence of the winesses, Bill Beatty, Sam Green, W. M. Gillentine and Henry Lennox.   The motion was overruled and the defendant excepted.   Appellant also made a motion for a new trial on the ground set forth in his application for a continuance, which was overruled, and the defendant saved his exceptions thereto.

The application shows that Lennox was present at the time of the homicide, and that his testimony would be material for the defendant. As to the diligence to procure this witness, it appears that the indictment in this case was presented on the 19th of January, and the defendant was immediately arrested; and on the 26th of January the case was set down for trial on February 20th.   The defendant did not have subpœna issued until the 28th of January.   The application further shows that the said Lennox was used as a witness by the defendant at the examining trial, and pending the final trial was in the custody of appellant, who had agreed to pay his board at a certain hotel or boarding house in Fort Worth; that said witness remained there until the 2nd or 3rd of February; that about said time the witness left, leaving a note, which the appellant attached to his motion, stating, that he had gone, without stating where to, and requested appellant to pay the balance of his board, as he had agreed to do.   It is also shown that said witness, Len-

nox, lived in Minnesota. The witness appearing to be a transient person, it was the duty of the appellant to have had process issued for him at the earliest possible date, but it seems he allowed nine days after he was arrested, to elapse before application for process was made for said witness. If process had been applied for promptly, the officers may have been enabled to secure service on said witness. Furthermore, it appears that the said witness, after process had been issued, was in Fort Worth for three days thereafter, and was a transient person, in custody of the appellant, his whereabouts known to defendant, and it is not to be presumed that the officers knew him, or at what particular place in the city of Fort Worth he could be found. Certainly, under the circumstances of this case, it was the duty of the appellant to have promptly informed the officers where said witness could be found, so that process could be served on him; and, if he had any apprehension that the attendance of the said witness could not be secured by the mere service of a subpœna, it was his duty, instead of undertaking to secure his attendance by his personal custody of said witness, to have taken steps to secure his attendance by legal means. In this connection, it will be noticed as a significant fact, that the appellant in this case had paid the board of the said witness up to the date of the issuance of said subpœna, but not beyond that time; and the note to appellant suggests that the contract of personal custody expired with the issuance of said subpœna, and that the witness was then at liberty to go where he pleased. Furthermore, although said note was received by the defendant on the 2nd of February, no effort whatever is shown from that time on up to the date of the trial to ascertain the whereabouts of the said witness. As to the witness Gillentine, it was alleged that he was a resident of Dallas County, but was temporarily in Erath County. Process, by attachment, was issued for him on the 18th of February. It was proposed to be shown by him that the deceased, Rushing, had entered into a conspiracy and made threats to kill the appellant on the night in question, on which the deceased was killed. Gillentine subsequently appeared in court, and was present at the trial, but was not placed on the stand by the appellant.

As to the witnesses, Beatty and Green, they both lived in Tarrant County, and were under process of subpœna. By both of these witnesses it was proposed to prove that the deceased had made antecedent threats to kill the defendant. The threats proposed to be proved by the first witness were not communicated to the defendant, and the threats proposed by the second witness were communicated to the defendant prior to the killing. It is not shown in the application how far from the county seat said witnesess lived. No process of attachment was asked or issued for them, and as the trial in this case lasted several days, if the defendant considered their testimony material, it would appear that their attendance could have been secured by the issuance of other process, at least some further effort should have been made in that direction. But, considering the evidence in the case, to our minds, it is at least doubtful whether said testimony of threats was material on the trial of this

case. There was evidence of threats produced on the trial, but the evidence fails to show any overt act on the part of the deceased to carry out said threats against the defendant. The State proved by a witness, J. H. Phelps, that he was present during the difficulty, in which Rushing was killed; and that he saw no weapon in Rushing's hand. Said witness was then asked by the State's counsel: "If the deceased, Rushing, had a knife or pistol, or any other weapon in his hand, state whether or not you were in a position you could have seen it." This question was objected to as being leading and argumentative. The court overruled the objection, and the witness answered in the affirmative. The defendant saved his bill of exception to said question and answer. The witness, Phelps, had previously described the difficulty and the situation of the parties during said difficulty, and that Rushing was. in his view during the entire progress of the difficulty, and he testified that he had no knife or other weapon in his hand, and we see no error in the action of the court in permitting the question and answer complained of. See, Fulcher v. State, 28 Tex. Crim. App., 465.

While the witness, Strong, was on the stand, the witness stated, on examination by the State, that he told Maddox that he was going to make complaint against several gambling houses, that he could not run, and didn't think anybody else had any more right to run than he had. On this point the defendant's counsel proposed to prove by said Strong, on cross-examination, that Maddox told him that if he would make complaint against McGrath, that he would serve the process. This ⸢testimony was objected to by the State, and the objection was sustained, and defendant excepted. It does not occur to us that it was material to show that the marshal or city officers of Fort Worth would serve processes placed in their hands on complaints filed in the City Court. This is to be presumed. At least we fail to see how the rejection of such testimony in any wise injured the rights of the appellant. Nor was it material to show, on the part of the defendant, that Maddox told Strong that he thought he was mistaken about defendant McGrath's "jobbing him"—meaning thereby that McGrath was seeeking to have the rival gambling house of Strong closed up. It was immaterial what Maddox thought about this. It appears from the eighth bill of exception in this case, that the difficulty which occurred between Strong and McGrath on the Saturday night preceding the Sunday night of the killing, was gone into at considerable length, and the details thereof testified to before the jury. This was all done without objection on the part of the appellant, until the witness had told all of the circumstances that led up to the fight, and then that the parties (McGrath and Strong) began fighting. At this juncture, counsel for the State, asked the witness: "What did the parties fight with?" Appellant objected to this question, which objection was overruled by the court, and the witness answered: "With pistols; they beat one another with their pistols." In the further progress of the testimony of the said witness, detailing said matter, the witness stated, that while they were fighting, Strong's pistol dropped,

and he then seized the pistol of the defendant, and the defendant holloed to his brother, Peter Crow "shoot him; kill him." This testimony was also objected to by appellant, and he reserved his bill of exception to its admission. This bill of exception states, as the ground thereof, that the same was irrelevant and immaterial. Counsel should have stated distinctly the reason for the objection to this testimony; and this should have been set forth in the bill of exception. The statement that the same was irrelevant and immaterial is entirely too general.

The allegations of a bill of exceptions should be full and explicit, and where the objection is to the admissibility of testimony, the very ground of objection should be stated, so that the question may be fairly presented to the court; and the mere statement, as a ground of objection, that the testimony is immaterial, is not sufficient, unless obviously the testimony cannot be considered material for any purpose. (See Thompson on Trials, Secs. 593 to 697, inclusive, and collated authorities in notes; Willson's Crim. Proc., § 2516.) We would further observe that if the details of the difficulty of Saturday night, was not proper evidence in the case, the defendant should have promptly objected to the introduction of any of the details of said difficulty; or if he was taken unawares, and certain details admitted, he should have presented a motion to strike out. He should not be permitted to allow the introduction of a part of the details and permit them to remain in evidence, and then object to the remainder. By this means he might get certain of the details that suited his purpose in evidence, and then cut off further testimony on the subject. In this case the details of the fight of Saturday night had been fully gone into, and if they were calculated to prejudice the appellant, it was with his consent and permission, as he failed to object thereto. There was no motion to strike out, and we fail to see how the admission of the further facts connected with the said difficulty in any wise prejudiced him. In the ninth bill of exception, when Carter, who was a witness for the defendant, was on the stand, on cross-examination, he was asked by the State, "If he didn't take one Milton Black home with him on the night of the homicide?" Appellant objected to this question—his objection was overruled and he saved his exception. The grounds of objection here urged was that the said testimony was immaterial, irrelevant and incompetent; and what has been said before with reference to the requirement that the specific ground of objection should be stated is applicable to this. If, however, it be conceded that the bill presents an objection in a tangible and legal shape, we fail to discover how this testimony was calculated to prejudice the appellant. Milton Black was not a witness in the case, his testimony was not before the jury, and nothing is shown as to said matter that could be considered injurious to the appellant.

With reference to the tenth bill of exception, the same observations made in regard to the two preceding bills, hold good as to this. Besides, in our opinion, it was competent to show that the defendant's witness, Shields, had been engaged in renting rooms to prostitutes as testimony

going to his credit before the jury.   With reference to the testimony of
Sam Mackham, in regard to what occurred at Strong's saloon between
him and Bob Miller, as to the pistol which Bob Miller had on that night,
inasmuch as the defendant had shown that Bob Miller had a pistol at
defendant's saloon on that night, it was competent, on the part
of the State, to show in rebuttal thereof, that after that, his pistol
was left at Strong's saloon; and what occurred between said Miller and
Mackham, with reference to said pistol, was proper to be shown.   In
the thirteenth bill of exception, appellant complains of the actions of
the court in excluding the testimony of Yancy, Paddock, Ward and
others, to the effect that they were acquainted with the general rep-
utation of appellant, McGrath, for truthfulness, and that it was good.
Appellant insisted that this testimony was proper, inasmuch as ·there
was a conflict between the testimony of appellant and other witnesses in
the case, and on this account it was claimed that appellant had a
right to offer evidence of his reputation for truthfulness in the
community where he resided.   The general rule on this subject
is, that where there is a mere conflict of evidence between witnesses,
that the testimony of a witness in such case, cannot be supported by
evidence of general reputation for truth.   This court has heretofore ad-
mitted, as an exception to this rule, that if the witness be a stranger in
the community where the trial is had, evidence of his reputation for
truth in the neighborhood where he lives may be offered in support of
his testimony. . See, Phillips v. State, 19 Tex. Crim. App., 158. This
case does not come within the exception laid down in said case.

In appellant's fourteenth bill of exception, he objects to the charge
of the court on murder in the first degree.   We see no objection to said
charge, but inasmuch as appellant was acquitted on said charge, it is not
necessary to discuss it.   In defining implied malice, the court, as a part
of the charge on said subject, used the following language:   "Implied
malice is that malice which the law infers from or imputes to certain
acts; that is to say, when the fact of an unlawful killing is established,
and there are no facts nor circumstances in evidence which establishes
the existence of "express malice," and none which reduce the killing to
manslaughter, and none which excuse or justify the killing, then the law
implies malice."   And further charged in this connection as follows:
"If you believe from the evidence in this case, that the defendant,
Martin McGrath, did, in Tarrant County, on or about the time alleged
in the indictment, unlawfully kill James Rushing, by shooting said
Rushing with a pistol, and should also believe from the evidence that
the defendant in so doing acted with malice, but should not be satisfied
beyond a reasonable doubt that he acted upon express malice, then it
will be your duty to find the defendant guilty of murder of the second
degree, and assess his punishment at confinement in the penitentiary for
some period of time not less than five years."   The appellant's conten-
tion in this connection is, that the court, in the beginning of the said
charge defining malice, left out the words, "tends to show," etc.   This

phrase, "tends to show," is ordinarily used in a charge defining implied malice, but, strictly speaking, the charge in question covers the entire scope between express malice and manslaughter, and justifiable homicide. If the evidence on the one hand tends to establish express malice, it is then a question for the jury; and if, on the other hand, it tends to reduce, mitigate or justify, it is also a question for the jury. Accurately speaking, if the facts do not show on the one hand a murder upon express malice, and do not show on the other hand circumstances that mitigate, excuse or justify, and it is an unlawful killing upon malice, it is implied malice. If the facts in a given case tend to show express malice, it still might be a case of implied malice; and it seems to us that it is more in keeping with the correct definition, and more liberal towards the defendant, to require that the facts absolutely show express malice before the jury would be required to deprive a defendant of implied malice. In other words, the mere tendency of the facts on the one hand or the other is not enough; the facts must show express malice on the one side, and circumstances of mitigation, reduction or justification on the other, to constitute a succinct and proper definition of implied malice, and as giving the correct boundary lines thereof. Of course, in reviewing a charge where different degrees of murder are charged, it is the duty of the court ordinarily to charge reasonable doubt as between the degrees. In our opinion, there was no error in the charge of the court on this subject.

As to the method by which the jury should pass on the credibility of the witnesses, the court charged them as follows: "The jury are the exclusive judges of the credibility of the witnesses, of the weight of the evidence and of the facts proved, you should reconcile all conflicts in the testimony if you can, but if you cannot you must decide which of the testimony is entitled to the greater credibility and weight, and in so determining you may consider the intelligence, interest, apparent bias or prejudice, if any, of the witnesses, as well as their manner of testifying." This charge was objected to by appellant,—the contention being that under the circumstances of this case, appellant, as well as his brother being witnesses on behalf of defendant, it was calculated to call the attention of the jury to their interests in the case. A similar charge to this was approved by this court in Cockerell v. The State, 32 Tex. Crim. Rep., 585. The appellant complains that in the charge of the court there was a failure to instruct the jury: "That the defendant had the right to act upon the reasonable appearances of danger to himself or his said brother, and that such charge fails to inform the jury that they were to view the matter from defendant's standpoint." The court, in its charge, did not give a general charge on the law of self-defense. The evidence in the case presented two theories, one as developed by the State's testimony, which did not make the killing less than murder in the second degree, and one arising from the defendant's testimony, which, if believed, presented a case of self-defense. The court, instead of giving the ordinary charge on self-defense, gave a special charge as

applied to the facts testified to by the defendant's witnesses. The charge on this subject was as follows: "If you believe from the evidence that the defendant did shoot and kill James Rushing at the time alleged in the indictment, but that at the time he did so there was a personal struggle or contest going on between the said James Rushing and the defendant's half-brother, John Mantle, called by the witnesses 'Bread-Wagon Johnnie,' in which struggle or contest said Rushing and said half-brother were striving for the possession or control of a pistol, and that the defendant fired upon or killed said James Rushing to keep him from getting the pistol from said half-brother, or to prevent the said Rushing from shooting or injuring the said half-brother with said pistol, then it will be your duty to acquit the defendant; or, if you are not satisfied beyond a reasonable doubt that such struggle and contest over a pistol between the said Rushing and Mantle was not going on at the time the defendant began to shoot said Rushing, then you will acquit." This charge was predicated upon and directly applicable to the facts proven by the defense, and such charge gave the defendant the full and complete right of self-defense. If the jury should believe that at the time such struggle was going on between John Mantle (the half-brother of defendant) and James Rushing, regardless of how such struggle began, or who was the aggressor, it was not necessary in this case to charge upon appearances of danger from the standpoint of the defendant, because he testified himself, and the special charge in question was predicated directly upon his testimony and that of two other witnesses. Appellant testified that he saw the struggle, and described it, and that he shot the deceased to prevent him from shooting his brother, and then shooting him. The charge on this subject was certainly as favorable to the defendant as he could have asked. What has been said in this connection is applicable to the assignment of error on the part of the appellant, that the court failed to charge on manslaughter. As we view the record, there was no manslaughter in this case. The testimony of the State's witnesses was believed by the jury. As stated before, it was a case of at least murder in the second degree. Said testimony fails to disclose any act, word or gesture on the part of the deceased at the time of the killing in connection with anything that had transpired before that time, that required a charge on manslaughter, and if we view the case from the standpoint of the defendant's witnesses, if they were to be credited, it was a case of self-defense, and nothing else. It could have been neither manslaughter nor murder. The jury in their verdict approve the theory as presented by the evidence on the part of the State, and we see no reason for disturbing their verdict. The judgment and sentence of the lower court is affirmed.

*Affirmed.*

ON MOTION FOR REHEARING.

HENDERSON, JUDGE.—This case comes before us on a motion for
rehearing. Appellant contends that, in order to define murder of the
second degree, upon implied malice, it was the duty of the court to define
manslaughter; and to support this contention he cites us to Whitaker v.
State, 12 Tex. Crim. App., 436. We have examined the opinion in said
case, and it appears that the court rendering it entertained the view that
manslaughter should be defined in connection with the charge on implied
malice, in order to give a proper definition of implied malice. In that
case, the court gave a charge on negligent homicide, but the opinion
does not show whether or not charges were submitted on manslaughter
and self-defense. If they were, the opinion in said case was clearly er-
roneous. See Childs v. State, post p. 573. If, however, the principle
of the decision in the Whitaker case is right, then, in order to ade-
quately define murder of the second degree, upon implied malice, it
necessarily follows that the court should also define excusable homicide
and self-defense, as well as manslaughter, in order that the charge on
implied malice may be properly understood. We do not think this
contention can be sustained. As we understand it, murder of the
second degree is a homicide upon malice, and the intent to kill upon
malice is formed in a mind excited by passion. This passion, however,
is not engendered upon adequate cause, as in manslaughter; nor has
manslaughter the ingredient of malice, as in murder of the second de-
gree. Now, when the court tells the jury, in order for there to be a
killing upon malice, there must be, on the one hand, a killing upon malice
aforethought, but the malice must not be express; and, on the other,
that there must be no circumstances to reduce the killing to manslaughter,
or to excuse or to justify the act, the court has given the boundaries of
the offense. It is true, the definition is of a negative character; but, so
far, it is the only definition of the offense given in our Reports. When
such a charge is given, if there is nothing in the facts of the case calling
for charges on lower grades of homicide or justifiable homicide, why
charge the jury on those subjects? The charge above given is equivalent
to instructing the jury that there is no element of said lower grades of
homicide or justifiable homicide in the case. It is tantamount to telling
them that, if there was malice in the offense, and they find it was formed,
not in a sedate and deliberate mind, but in one disturbed by passion,
there are no facts in the case constituting adequate cause for such passion,
and that, in such event, they must find the killing upon implied malice.
It does not occur to us that it is necessary, in a case where no grade of
felonious homicide is submitted lower than murder in the second degree,
for the court, in order to give a charge upon implied malice, that it
should, after indicating that, if there was any evidence tending to show
that the killing was under circumstances which reduce the offense to
negligent homicide or manslaughter, or which excuse or justify the
homicide, and then go further, and, in connection with the charge on

implied malice, to define the offense of manslaughter, negligent homicide, and the circumstances which excuse or justify the act. We do not deem it necessary to discuss the other matters set out in the motion for rehearing. The motion is overruled.

*Motion Overruled.*