Eugene Cooper v. The State.

No. 2712.    Decided December 17, 1913.

**1.—Murder—Negligent Homicide—Motive.**

The issue of negligent homicide was not raised. Upon trial of murder, there was no error in admitting testimony showing a continuous ill-treatment of deceased by defendant, her husband, to the very time of the killing.

**2.—Same—Evidence—Witnesses under Rule—Discretion of Court.**

The law gives the trial judge wide discretion in permitting witnesses to testify who have not been placed under the rule, and where no abuse of discretion was shown, there was no error.

**3.—Same—Evidence—Leading Questions.**

Where, upon trial of murder, the record on appeal showed that the questions propounded by State's counsel were legitimate, and not such leading questions

as were objectionable, there was no error. Following Carter v. State, 59 Texas Crim. Rep., 73.

**4.—Same—Murder in the Second Degree—Charge of Court.**

Where, upon trial of murder, the court gave a proper charge on murder in the second degree, there was no error.

**5.—Same—Charge of Court—Exculpatory Statements.**

Where, upon trial of murder, the defendant claimed accidental shooting, and this question was properly submitted to the jury, there was no error.

**6.—Same—Charge of Court—Implied Malice—Unlawful Killing.**

Where, upon trial of murder, the court properly submitted the question of implied malice, there was no error on this ground. Following McCoy v. State, 25 Texas, 33, and other cases.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Monroe.

Appeal from a conviction of murder in second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*Taylor & Forrester,* for appellant.—On question of asking leading questions: Garrett v. State, 52 Texas Crim. Rep., 255; Dunagain v. State, 38 id., 614; Goodsoe v. State, 52 id., 626; Wright v. State, 10 Texas Crim. App., 476; Rangel v. State, 22 id., 642; Nolen v. State, 8 id., 585; Ripley v. State, 51 Texas Crim. Rep., 126; Davis v. State, 43 Texas, 189.

On question of inforcing rule as to placing witnesses under rule: Health v. State, 7 Texas Crim. App., 464.

On question of court's charge on murder in second degree: Elliston v. State, 10 Texas Crim. App., 361; Curtis v. State, 22 id., 227; Howard v. State, 25 id., 686; Saye v. State, 50 Texas Crim. Rep., 569.

On question of unlawful killing: Morgan v. State, 16 Texas Crim. App., 593; Miles v. State, 18 id., 156; Turner v. State, 16 id., 378; Thomas v. State, 45 Texas Crim. Rep., 111.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree and his punishment fixed at twenty-five years confinement in the penitentiary.

The statement of facts is quite lengthy. The material evidence, however, is not extensive. The statement shows the witnesses were examined in chief, crossed, re-examined, re-crossed over and over again,—simply a rehashing of the same matter without developing anything additional in most of the re-examinations. The appellant and his deceased wife, whom he was convicted of murdering, and appellant's sister and a man by the name of George Bradshaw, all lived in a small house at the time of the killing. Appellant and his wife in one room and appellant's

sister and Bradshaw in another. They had been thus living for a few months prior to the killing. Between 7 and 8 o'clock on January 5, 1913, these four persons together went to a picture show in Waco, where they remained till about 10 o'clock; they then went to a negro club house, all the parties being negroes, where they remained, dancing, drinking and frolicking till 3 or 4 o'clock in the morning. Bradshaw and appellant's sister went home first and went to bed. Appellant and his wife went later.

At the time of the killing appellant and deceased had been married less than thirteen months. For several months after their marriage they lived at a different place from where the killing occurred. A few months before the killing they moved to the place where it occurred.

Gussie Perry, a sister of deceased, testified that she knew how appellant treated deceased when he found deceased had been to see any of her kinfolks; that he treated her mean, though she never saw him strike her; that on the Saturday night before the killing, deceased was at her house when appellant came and knocked on the door, deceased opened it and he told her to "come on down, you know it's 7 o'clock."

Ella Ware, deceased's cousin, testified she knew of trouble between Ada Moore, deceased and appellant, after deceased and appellant were married; that deceased caught appellant in bed with Ada and at the time pulled him out of the bed and then told Ada that she had married appellant and didn't want to catch her with him any more. Thereupon, Ada jumped on, and had a fight with deceased; that this Moore woman was not the only one that appellant had anything to do with; that there was another woman by the name of Crystine; that after appellant and deceased were married they were at a picture show one night and appellant sat by Crystine in this show; that deceased went to him and wanted him to come and sit with her; that he told her to go on back, and after they went home from the picture show appellant jumped on deceased, hit her with his fist and started to hit her again when he was prevented by one who was present; that appellant just stayed with deceased when he got ready.

Mrs. Mattie Hayden, a white neighbor, testified she lived directly across the street from appellant and deceased at the time of the killing and for a few months continuously theretofore; that sometimes appellant seemed to be kind to deceased and then again he would abuse her; that she had heard him curse her and had seen him draw a gun on her in the fall, during cotton picking time before the killing; that he seemed to be mad at the time but his wife was laughing; that the night of the killing she heard appellant and deceased when they got home just before the killing; when he stepped up on his gallery, she heard him say, "I will show you"; that they went in the house when she heard loud talking, but couldn't hear what they said, and that she then heard the report of the gun.

The evidence further shows that the woman Ada Moore was at the club house with the others the night of the killing. Lizzie Brown, who

was at the club that night, testified that appellant's mother was also there, and that she and appellant's mother lived together, but after they separated when going home that she went on home, but appellant's mother stayed, waiting to see appellant; that she did not know what she wanted to see him for, but that some of the parties at the club said they, appellant and deceased, were fussing up at the club; that she never heard it herself; that afterwards appellant's mother come on to her house and still later appellant and his wife, going to their home, passed their house, and appellant's mother, hearing them, opened the door and called to deceased, saying, "Was he there?" Deceased replied, "Oh, I don't know."

Edna Cooper, appellant's sister, who lived in the house with them and George Bradshaw, on cross-examination, testified that she had heard appellant and deceased fuss and then make up several times while they were living together; that it was just kind of fussing,—not real fussing; that appellant did not fuss with the deceased much; that she didn't know what appellant had ever had to do with Ada Moore, but had seen them talking together, like that; that she had heard deceased hurrahing appellant about Ada Moore and she herself had hurrahed him about her.

George Bradshaw, who was living in the house with appellant and deceased and appellant's sister, Edna Cooper, and had for some time before the killing, testified that he went home that night before appellant and deceased and when they came he had gone to bed and was asleep; that about 3 or 4 o'clock in the morning appellant and deceased came home and appellant did not knock at the door, but shook it and before he could get to it shook it again; that he then opened it and said to appellant, "Hell, quit that beating at the door that way"; that he went on back to his bed and the deceased and appellant came in the room; that a lamp was burning at the time; that the deceased walked up to the dresser and took her hat off and put it on the dresser; that appellant went over to where his gun was, picked it up, backed back a few steps, breeched and unbreeched the gun, and said to deceased, "You are always talking about killing me." She said, "I wouldn't hurt you for nothing, Eugene." He said, "You are always talking about killing me." She said, "No, Eugene, don't shoot me, I wouldn't hurt you for nothing." And he said, "You are a damn lie" and shot her in the left arm and left side from which wound she died a few hours later; that all the time from the time appellant picked up the gun on this occasion, while he was breeching and unbreeching it, and backed a few steps, he was pointing the gun all the time at the deceased and seemed to be a little mad.

It seems that the firing of the gun or the commotion at the time put out the light. Deceased, when shot, fell and began holloing and calling for Edna Cooper. Edna relighted the lamp and finding deceased shot, Bradshaw went off after a doctor and told the police. He couldn't find a doctor but the police at once went to the house where the killing occurred. Soon after, or about the time, the police got there the doctor arrived. In the meantime many of the neighbors, hearing the shooting

and the commotion, hurriedly went over to the house. Numerous witnesses who first got there and the policemen testified that when they first got to the parties, deceased had been put on the bed, appellant was standing or kneeling by her or alternately one or the other, and trying time and time again to get her to say she had shot herself. The deceased would never say so; that the deceased would not tell the doctor, any of the policemen or others present, who had shot her or how it had occurred, until repeatedly urged and pressed to do so; that appellant at first expressly denied that he had shot her. During the time appellant went out of the room somewhere. While he was absent deceased then told the police and those present that the appellant had shot her; they then had him come back in the room where she was. The substance of the testimony of the policemen then is that she again stated to appellant that he had shot her, and Mr. Harbour, one of the policemen, testified that when appellant was first called back in, he said to deceased, "Honey, you done it." She replied, "Honey, you done it," and he said, "No, I didn't either." She said, "Yes you did, you know you did." He then said, "Yes, I did do it, but it was an accident. I taken the gun off of the bed and went to set it in the corner and it went off and shot her."

Appellant himself testified in effect denying that he had tried to get deceased to tell that she had shot herself and he denied that he had denied shooting her, but claimed in his testimony on the trial that he had shot her accidentally; that the gun went off when he was breeching or unbreeching it and that he had no intention of shooting or killing her. He did testify that when they came from the club that night and his wife was at the dresser, she said, "I ought to kill you," something about like that and that reminded him of his gun. He denied the balance of the conversation between them as testified to by Bradshaw. He also in effect denied that he had any trouble or mistreated his wife at any time, and expressly denied the testimony of Mrs. Hayden. In fact, his whole testimony and defense was an accidental shooting and killing.

We have carefully read and studied the evidence and in our opinion negligent homicide was not raised, and the court did not err in refusing to submit such question to the jury.

By one of appellant's bills of exception he objected to the testimony of said witness Ella Ware as to what she testified about his treatment of the deceased, claiming that the transaction and matters told about by her were too remote from the killing and no relation or connection therewith was shown between those transactions and the killing, and such evidence was calculated to prejudice the jury against him, and such testimony would throw no light or illustrate his motive in the killing. We think this testimony was admissible of and within itself, but especially so in connection with the testimony of other witnesses showing practically a continuous ill treatment of her by him down to the very time of the killing. See section 1235, White's Ann. P. C.; and section 1074, subd. c, of his Ann. C. C. P.

By another bill he complains that the court erroneously permitted said witnesses Ella Ware and Gussie Perry to testify because they had been present in the courtroom and heard the testimony of George Bradshaw after the rule had been invoked and enforced. The court, in allowing this bill, explained and qualified it by stating that the State's attorney did not know that said witnesses knew anything about the case at the time the rule was invoked, but was advised that relatives of deceased were in court. After court adjourned he then talked with them and on the following morning had them sworn and placed under the rule; that the case had been on trial only one half day and they heard no other witness testify except Bradshaw. The law in such matters, as uniformly held by this court, gives the trial judge wide discretion in permitting a witness to testify under such circumstances, and will not reverse a case where he has thus used his discretion, except in clear cases of abuse. Branch's Crim. Law, sec. 881, and cases cited. We think, under the circumstances, the court did not improperly exercise his discretion in permitting these witnesses to testify.

By his only other bill he complains that the court erred in permitting the character of examination by the county attorney of the State's witness, said Bradshaw, in effect that he asked him leading questions and held a paper in front of him, the county attorney, and questioned the witness from said paper, representing that it was a written statement signed by the witness in the county attorney's office three days after the shooting. The bill develops that the witness at that time did not remember or would not remember that he had told the county attorney that immediately before the shooting of the deceased by the appellant she told appellant "not to *shoot* her"; he then testified that she said not to *hurt* her. The court, in approving this bill, qualified and explained it by stating that the paper mentioned as being held before the county attorney while he was examining this witness was a statement made by said witness shortly after the killing in which the witness made the statement that the deceased said to defendant "don't shoot me." The witness did not answer the question as indicated in the bill, but was recalled by the State on the day following his first appearance on the stand when he testified without hesitation that deceased said to defendant, among other things, "don't shoot me." As qualified by the court, this bill presents no error. Carter v. State, 59 Texas Crim. Rep., 73.

In submitting murder in the second degree to the jury for a finding the court charged the jury: "Now, if you believe from the evidence, beyond a reasonable doubt, that the defendant, Eugene Cooper, in the County of McLennan and State of Texas, did, on or about the time alleged in the indictment, with a gun, and that the same was a deadly weapon, and one reasonably calculated and likely to produce death by the mode and manner of its use in a sudden passion, and not under circumstances which would reduce the killing to an accidental or excusable killing, did unlawfully, and with implied malice, shoot and thereby kill

said Pearl Cooper, you will find him guilty of murder in the second degree, and assess his punishment at confinement in the penitentiary for any period that the jury may determine, provided it be for not less than five years."

Then immediately followed it with the further charge: "Homicide is excusable when the death of a human being happens by accident or misfortune. Now, if you believe from the evidence, that the defendant shot and killed the said Pearl Cooper, but if you further believe from the evidence that in the breeching or unbreeching or handling the gun with which the shooting, if any, was done, said gun was accidentally discharged, thereby shooting and killing the said Pearl Cooper, or if you have a reasonable doubt thereof, then you will return a verdict of not guilty." These charges correctly submitted the issues to the jury and the court did not err in refusing appellant's special charge No. 2 on the subject of excusable homicide by accident or misfortune as the court's charge had fully and substantially already so charged.

Under the state of the evidence in this case the court was not called upon to give appellant's third special charge requiring that as the evidence introduced by both the State and the defendant as to his admissions and statements in which he stated that he shot and killed the deceased by accident and did not intend to shoot and kill her, that the State must show that his said statement was false, otherwise to acquit him. Besides, in submitting the case to the jury, as shown above, the court in effect, did so charge and the jury could not have found the verdict it did, without believing that his claimed accidental shooting deceased without intention to kill her, was false.

The court in this case correctly defined murder in the first degree in accordance with the statute. He also fully defined express malice. In a separate paragraph he quoted the latter part of the definition of murder, article 1140, Penal Code, "murder is distinguishable from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide." Then he charged on murder in the second degree as follows: "Malice is also a necessary ingredient of the offense of murder in the second degree. The distinguishing feature, however, so far as the element of malice is concerned, is that, in murder in the first degree, malice must be proved to the satisfaction of the jury, beyond a reasonable doubt, as an existing fact, while in murder in the second degree malice will be implied from the fact of an unlawful killing.

"Implied malice is that which the law infers from or imputes to certain acts, however suddenly done. Thus, when the fact of an unlawful killing is established and the facts do not establish express malice beyond a reasonable doubt, nor tend to mitigate, excuse or justify the act, then the law implies malice, and the murder is in the second degree; and the law does not further define murder in the second degree than if the killing is shown to be unlawful, and there is nothing in evidence on the one hand showing express malice and on the other hand

there is nothing in evidence that will reduce the killing below the grade of murder, then the law implies malice, and the homicide is murder in the second degree.

"The instrument or means by which a homicide is committed are to be taken into consideration in judging the intent of the party offending. If the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless from the manner in which it was used such intention evidently appears."

Appellant complains of this part of the court's charge wherein the court states "that in murder in the second degree malice will be implied from the fact of an unlawful killing," claiming that this is not the law and that such language should not have been used in the charge in this case.

In the recent case of Hicks from Caldwell County, not yet reported, in discussing this identical question, we said: "The definition of murder in the second degree and how and when the law infers malice from an unlawful killing in exact accordance with the two paragraphs of the court's charge above quoted, has been the established law of this State ever since we have had two degrees of murder. Judge White, in his Annotated Penal Code, in sec. 1257, after stating what is ipso facto murder of the first degree, says: 'If, however, they do not establish murder committed in one of these modes, and do not show any justification, excuse or mitigation for the homicide, the law implies the malice and the murder is in the second degree,' citing McCoy v. State, 25 Texas, 33; Jordan v. State, 10 Texas, 479; Hamby v. State, 36 Texas, 523; Jones v. State, 13 Texas, 168; Atkinson v. State, 20 Texas, 522; Farrer v. State, 42 Texas, 265; Ferrell v. State, 43 Texas, 503; Hill v. State, 11 Texas Crim. App., 456; Ellison v. State, 12 Texas Crim. App., 557; Neyland v. State, 13 Texas Crim. App., 536; Martinez v. State, 30 Texas Crim. App., 129; Childers v. State, 33 Texas Crim. Rep., 509; Baltrip v. State, 30 Texas Crim. App., 545.

"Again, in section 1259, he says: 'Implied malice is the essential characteristic of murder in the second degree. It is not a fact, but an inference or conclusion deducible from particular facts and circumstances judicially ascertained. Thus, when the fact of an unlawful killing is established and there are no circumstances in evidence which show the existence of express malice, or which tend to mitigate, excuse or justify the act, then the law implies malice and the offense is murder in the second degree,' citing Martinez v. State, 30 Texas Crim. App., 129; Harris v. State, 8 Texas Crim. App., 90; Tooney v. State, 5 Texas Crim. App., 163; Douglass v. State, 8 Texas Crim. App., 520; Hubby v. State, 8 Texas Crim. App., 597; Hill v. State, supra; Ellison v. State, supra; Neyland v. State, supra; Reynolds v. State, 14 Texas Crim. App., 427; Turner v. State, 16 Texas Crim. App., 378; Stanley v. State, 16 Texas Crim. App., 392; Smith v. State, 19 Texas Crim. App., 95; Hart v. State, 21 Texas Crim. App., 163; Baltrip v. State, 30 Texas Crim. App., 545.

"This court in Barton v. State, 53 Texas Crim. Rep., 443, expressly approved and commended as admirably presenting the law on the subject, a charge of which the two paragraphs first above quoted are literally the same. Mr. Branch, in his Criminal Law, sec. 426, in the first subdivision on page 255, gives as a correct charge, substantially the first paragraph above quoted, citing Douglass v. State, 8 Texas Crim. App., 520; Neyland v. State, 13 Texas Crim. App., 536, and Gonzalez v. State, 30 Texas Crim. App., 224, and then follows with a literal copy of the second paragraph as the law on the subject, and cites Barton, supra; McGrath v. State, 35 Texas Crim. Rep., 413; Smith v. State, 45 Texas Crim. Rep., 552; Carson v. State, 57 Texas Crim. Rep., 394, and Harris v. State, 8 Texas Crim. App., 90."

The charge of the court in this case was correct on this point and in accordance with the law, and appellant's objections thereto present no error. Taking the charge as a whole, which must always be done, it was an admirable announcement of the law and presents to the jury for a finding in accordance with the evidence in the case.

The evidence clearly was sufficient to sustain the verdict. No reversible error is pointed out and the judgment will be affirmed.

*Affirmed.*